# Exhibit A

IN THE CIRCUIT COURT
TWENTIETH JUDICIAL CURCUIT
ST. CLAIR COUNTY, ILLINOIS

FILED
ST. CLAIR COUNTY

MAR 2 4 2022

CIRCUIT CLERK

TIFFANY FOSHEE, as mother and next of
friend for deceased minor child ELIZABETH
EAST,

*Plaintiff,*

v.

ABBOTT LABORATORIES, ABBOTT
LABORATORIES, INC.,

*Defendants.*

Cause No. 22LA0244

**DEMAND FOR JURY TRIAL**

## COMPLAINT

1.      This action arises out of the catastrophic and preventable death of a newborn baby who died due to a deadly disease caused by cow's milk based infant formula and/or fortifier. Necrotizing Enterocolitis (hereinafter "NEC") is a deadly intestinal disease characterized by inflation and injury of the gut wall barrier that may advance to necrosis and perforation of the gut. Advanced cases of NEC may lead to surgery and to death.  Plaintiff is the parent and next of friend of decedent Elizabeth East (the "Plaintiff") who tragically died as a result of NEC.  Plaintiff brings this case against the Defendants for claims arising from the direct and proximate result of Defendants' negligent, willful and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distributing, labeling, failing to warn, and/or sale of cow's milk-based infant feeding products (hereinafter "Cow's Milk Products").

1

## **PARTIES**

2.     Tiffany Foshee is a natural person and a resident of Alabama.  Ms. Foshee brings this suit in her personal capacity and as Representative of the Estate of Elizabeth East, deceased.

3.     Defendant Abbott Laboratories is an Illinois corporation with its principal place of business at 100 Abbott Park Rd., Abbott Park, Illinois 60064.According to the Illinois Secretary of State, Abbott Laboratories Inc., is registered to do business in the State of Illinois and may be served via its registered agent: C T Corporation System, 208 SO Lasalle St. Suite 814, Chicago, IL 60604. Abbott Laboratories is incorporated in the state of Illinois and may be served via its registered agent: C T Corporation System, 208 SO Lasalle St. Suite 814, Chicago, IL 60604.

4.     Defendant Abbott Laboratories, Inc. is a Delaware corporation with its principal place of business at 100 Abbott Park Rd., Abbott Park Illinois 60064. Defendant Abbott Laboratories is an Illinois corporation with its principal place of business at 100 Abbott Park Rd., Abbott Park, Illinois 60064. According to the Illinois Secretary of State, Abbott Laboratories Inc., is registered to do business in the State of Illinois and may be served via its registered agent: C T Corporation System, 208 SO Lasalle St. Suite 814, Chicago, IL 60604. Abbott Laboratories is incorporated in the state of Illinois and may be served via its registered agent: C T Corporation System, 208 SO Lasalle St. Suite 814, Chicago, IL 60604.

5.     Collectively, Abbott Laboratories and Abbott Laboratories, Inc. are referred to herein as "Abbott."

6.     Abbott is a well-known manufacturer of cow's milk based infant feeding products and markets the majority of its products under the "Similac" brand name. Abbott also manufacturers fortifiers and other Cow's Milk Products.

## JURISDICTION AND VENUE

7.      This Court has general jurisdiction over this action because Abbott maintains its principal place of business in Illinois and because Abbott is incorporated in Illinois. 735 Ill. Comp. Stat. Ann. 5/2-209; *see also Rios v. Bayer Corp.*, 2020 IL 125020, ¶ 19 (June 4, 2020) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)).

8.      Venue is proper in St. Clair County because Abbott conducts business there. 735 ILCS 5/2-101; 735 ILCS 5/2-102(a).

9.      Specifically, as it relates to venue, Abbott regularly engage in sales transactions of its infant baby formula and/or fortifier products in the State of Illinois. Abbott sells such products at retail establishments throughout the State of Illinois including in St. Clair County. Additionally, Abbott regularly sell infant baby formulas and/or fortifier products to hospitals and neonatal intensive care units ("NICU") and hospital nurseries throughout the United States and Illinois.

## FACTUAL ALLEGATIONS

### *Elizabeth East's NEC Diagnosis*

10.      Elizabeth East was born prematurely at UAB Women & Infants Center on May 15, 2013.

11.      Elizabeth was fed Similac cow's milk-based products from shortly after her birth.

12.      Shortly after she first ingested Defendant's products, Elizabeth developed NEC.

13.      Elizabeth was forced to undergo surgery, and ultimately succumbed to her injuries, passing away on March 24, 2014.

## THE SCIENCE AND SCOPE OF THE PROBLEM

14.     Nutrition for preterm babies is extremely important. Since the United States ranks in the top ten countries in the world with the greatest number of preterm births, the market of infant formula and fortifiers is particularly vibrant here in the United States.

15.     Although cow's milk based infant formula may be good for bulking up pre-term, underweight babies quickly, science and research have advanced in recent years confirming strong links between cow-based products and NEC causing and/or substantially contributing to death in preterm and severely preterm, low-weight infants, long with many other health complications and long-term risks to these babies. Additionally, advances in science have created alternative fortifiers that are derived from human milk and non- bovine based products; however, the manufacturers of the Cow's Milk Products continue to promote and sell the Cow's Milk Product versions.

16.     To illustrate the danger posed to preterm infants, this is a diagram of the normal layers of the baby's intestinal wall:[1]

**Layers of the Intestinal Wall**



---

[1] All of the medical illustrations are provided to assist the Court in understanding this devastating disease and are subject to a copyright by MediVisuals, Inc. As such, they cannot be reproduced, reprinted, or used without permission of the copyright holder.

4

17.     Normal absorption in the small intestine looks like the diagram below. The cells lining the lumen of the intestines have microvilli that magnify the surface area available for uptake. Nutrients, which are color-coded in light blue, are absorbed by these cells, then transported through the cells, and released where they are then transported to the rest of the body through the bloodstream and lymphatic system. The cells keep out the bacteria and toxins that are present in the intestines which would be harmful if absorbed into the other tissues of the body. The tight junctions between each cell play a major role in preventing the bacteria and toxins from entering the body.

**Normal Absorption in Small Intestine**



18.    Whereas this diagram shows how the absorption is significantly altered following the intake of cow's milk based infant products:



19.    Specifically, the figure in the preceding paragraph demonstrates what the breakdown of the tight junctions looks like after a preterm baby ingests cow's milk-based products. As a result, the harmful bacteria and toxins are able to enter the baby's bloodstream and lymphatics, which induces an inflammatory response (not pictured) in the baby's intestinal walls.

20.    The below figure demonstrates the intestinal veins and lymphatics that transport the harmful bacteria and toxins that have entered the baby's intestinal wall following the ingestion of the Cow's Milk Products:



21.    The image below on the left is a simplified view of the major organs of the baby's chest and abdomen, as well as her circulatory system. The box at the top shows a magnified view of the normal functioning of small blood vessels and capillaries of the tissues throughout the body. As shown, tight intercellular junctions lining the capillaries prevent plasma from escaping into the surrounding tissues. By contrast, the baby depicted to the right is in distress, as is illustrated by her capillary bed where bacteria and toxins (shown in green) were transported from the intestines and spread to the rest of her body. These toxins further breakdown and weaken the tight, intercellular junctions, and as a result, bacteria, toxins, and plasma escape into the surrounding interstitial spaces resulting in a condition known as "third-spacing," and sepsis.



22.     This process is further illustrated in the series of images below, which all begin with the administration of Cow's Milk Products, leading to multi-system organ failure and death.

## Peritonitis Resulting in Sepsis and Death



23.    As far back as 1990, a prospective, multicenter study on 926 preterm infants found that NEC was six to ten times more common in exclusively formula-fed babies than in those fed breast milk alone and three times more common than in those who received formula plus breast milk. Babies born at more than 30 weeks gestation confirmed that NEC was rare in those whose

9

diet included breast milk, but it was 20 times more common in those fed formula only. A. Lucas, T. Cole, *Breast Milk and Neonatal Necrotizing Enterocolitis*, LANCET, 336: 1519-1523 (1990).

24.     A study published in 2009 evaluated the health benefits of an exclusively human milk-based diet as compared to a diet with both human milk and bovine milk-based products in extremely premature infants. The results show that preterm babies fed an exclusively human milk-based diet were 90% less likely to develop surgical NEC as compared to a diet that included some bovine milk-based products. S. Sullivan, et al, *An Exclusively Human Milk-Based Diet Is Associated with a Lower Rate of Necrotizing Enterocolitis than a Death of Human Milk and Bovine Milk-Based Products*, JOURNAL OF PEDIATRICS, 156: 562-7 (2010).

25.     In 2011, the U.S. Surgeon General published a report titled, "The Surgeon General's Call to Action to Support Breastfeeding." In it, the Surgeon General warned that "for vulnerable premature infants, formula feeding is associated with higher rates of [NEC]." U.S. Dep't of Health & Human Serv., Off. of Surgeon Gen., *"The Surgeon General's Call to Action to Support Breastfeeding,"* p.1, (2011). This same report stated that premature infants who are not breast fed are 138% more likely to develop NEC. *Id.*, Table 1, p.2.

26.     In 2012, the American Academy of Pediatrics issued a policy statement that all premature infants should be fed an exclusive human milk diet because of the risk of NEC associated with the consumption of Cow's Milk Products. The Academy stated that "[t]he potent benefits of human milk are such that all preterm infants should receive human milk... If the mother's own milk is unavailable ...pasteurized donor milk should be used." *Breastfeeding and the Use of Human Milk*, PEDIATRICS, 129:e827-e841 (2012).

27.     Further, a study published in 2013 showed that all 104 premature infants participating in the study receiving an exclusive human-milk based diet exceeded targeted growth

10

standards and length and weight and head circumference gain. The authors concluded that "this study provides data showing that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive human milk-based diet." A. Hair, et al, *Human Milk Feed Supports Adequate Growth in Infants ≤1250 Grams Birthweight*, BMC RESEARCH NOTES, 6- 459 (2013). Thus, inadequate growth was proven to be a poor excuse for feeding Cow Formula, but the practice continued largely due to extensive and aggressive marketing campaigns conducted by infant formula companies, including Abbott.

28.     Another study published in 2013 reported the first randomized trial in extremely premature infants of exclusive human milk versus preterm bovine-based formula. The study found a significantly higher rate of surgical NEC in infants receiving the bovine preterm formula and supported the use of exclusive human milk diet to nourish extremely preterm infants in the NICU. E.A. Cristofalo, et al, *Exclusive Human Milk vs Preterm Formula: Randomized Trial in Extremely Preterm Infants*, J PEDIATR., 163(6): 1592-1595 (2013).

29.     In another study published in 2014, it was reported that NEC is "a devastating disease of premature infants and is associated with significant morbidity and mortality. "While the pathogenesis of NEC remains incompletely understood, it is well established that the risk is increased by the administration of infant formula and decreased by the administration of breast milk." Misty Good, et al., *Evidence Based Feeding Strategies Before and After the Development of Necrotizing Enterocolitis*, EXPERT REV. CLIN. IMMUNOL., 10(7): 875-884 (2014 July). The same study found that NEC "is the most frequent and lethal gastrointestinal disorder affecting preterm infants and is characterized by intestinal barrier disruption leading to intestinal necrosis, multi-system organ failure and death." *Id.* The study noted that "NEC affects 7-12% of preterm infants weighing less than 1500 grams, and the frequency of disease appears to be either stable or

11

rising in several studies." *Id.* "The typical patient who develops NEC is a premature infant who displays a rapid progression from mild feeding intolerance to systemic sepsis, and up to 30% of infants will die from this disease." *Id.* Advances in formula development have made it possible to prevent necrotizing enterocolitis, and the "exclusive use of human breast milk is recommended for all preterm infants and is associated with a significant decrease in the incidence of NEC." *Id.*

30.     In 2016, a large study supported previous findings that an exclusive human milk diet in extreme preterm infants dramatically decreased the incidence of both medical and surgical NEC. This was the first study to compare rates of NEC after a feeding protocol implementation at multiple institutions and years of follow-up using an exclusive human milk diet. The authors concluded that the use of an exclusive human milk diet is associated with "significant benefits" for extremely preterm infants and while evaluating the benefits of using an exclusive human milk-based protocol, "it appears that there were no feeding-related adverse outcomes." Hair, et al, Beyond Necrotizing *Enterocolitis Prevention: Improving Outcomes with an Exclusive Human Milk Based Diet*, BREASTFEEDING MEDICINE, 11-2 (2016).

31.     A publication by the American Society for Nutrition, in 2017, noted that human milk has "been acknowledged as the best source of nutrition for preterm infants and those at risk for NEC." The study compared the results from two randomized clinical trials on preterm infants with severely low weight (between 500 and 1250 grams at birth) and compared the effect of bovine milk-based preterm infant formula to human milk as to the rate of NEC. Both trials found that an exclusive human milk diet resulted in a much lower incidence of NEC. While the study noted that bovine milk-based preterm formulas provided consistent calories and were less expensive than human milk-based products, the bovine-based products significantly increase the risk of NEC and death. The study also noted the "exponential" health care costs associated with NEC and noted

12

data from the U.S. from 2011-2012 that showed that the cost of NEC is $180,000 to $198,000 per infant and nearly doubles to $313,000 per infant for surgically-treated NEC. Further, NEC survivors accrue substantially higher outpatient costs. Jocelyn Shulhan, et al, Current *Knowledge of Necrotizing Enterocolitis in Preterm Infants and the Impact of Different Types of Enteral Nutrition Products*, ASN ADV. NUTR., 8(1):80-91 (2017).

## ABBOTT'S FALSE AND MISLEADING MARKETING REGARDING COW'S MILK BASED INFANT PRODUCTS

32.     Notwithstanding strong and overwhelming medical evidence establishing the extreme dangers that Cow's Milk Products pose for preterm infants, Abbott has marketed its Cow's Milk Products as an equally safe alternative to breast milk and has promoted these products as necessary for additional nutrition and growth. The Defendants have specifically marketed its formulas and fortifiers as necessary to the growth and development of preterm infants, when instead, these products pose a known and substantial risk to these babies.

33.     The Defendants have also engaged in tactics reminiscent of tobacco manufacturers by trying to "hook" moms when they are most vulnerable. They often offer free formula and other freebies and coupons in "gift baskets" given to mothers in hospitals, medical clinics, and even left at residential charities where out-of-town families have to stay when their babies are being treated for a substantial amount of time in the neonatal intensive care units of hospitals. By doing this, the Defendants are able to create brand loyalty under the guise of a "medical blessing" so that these vulnerable parents continue to use formula to feed their babies after they leave the hospital, resulting in great expense to parents, significant risk to the babies, and substantial profit to the Defendants.

34.     The Defendant's nefarious tactics go back decades, as Abbott continues to fight for its respective market share by scaring mothers with newborn infants, especially those who are

higher risk because they are born preterm. The Defendants advertise that its products are healthier, necessary for adequate nutrition, and the only appropriate choice for modern mothers. Often times these tactics discourage mothers from breast feeding at all, which then further reduces the supply of available breast milk.

35.     The World Health Organization ("WHO") and United Nation's International Children's Emergency Fund ("UNICEF") held a meeting more than two decades ago to address the international marketing of breast-milk substitutes. The WHO Director concluded the meeting with the following statement, "In my opinion, the campaign against bottle-feed advertising is unbelievably more important than the fight against smoking advertisement." Jules Law, *The Politics of Breastfeeding: Assessing Risk, Dividing Labor*, JSTOR SIGNS, vol. 25, no. 2: 407-50 (2000).

36.     Recognizing the abuse and dangers of the marketing of infant formula, in 1981, the World Health Assembly ("WHA"—the decision-making body of the world's Member States) developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk and outlawed any advertising or promotion of breast milk substitutes to the general public. As far back as 1981, the International Code of Marketing of Breastmilk Substitutes of Geneva World Health Organization, specifically prohibited advertising in Article 5 Section 1: "There should be no advertising or other form of promotion to the general public."

37.     While the Defendants acknowledge the Code and claim to support the effort to educate mothers to breastfeed for as long as possible, it often just pays lip service to it. The Defendants aggressively markets and continues to exploit the vulnerabilities of these families by

14

advertising directly to the new parents' darkest fears—that by not buying these products, they will somehow hurt their newborns by not giving them the very best chance of survival.

38.    In fact, Abbott employed deceptive tactics from the inception of the product. For example, the name "Similac," as in it is "similar to lactation," is deceptive, as it is designed to perpetuate a false sense that its product is similar to human breast milk.

39.    In addition to perpetuating the myth that these Cow's Milk Products are similar to breast milk, the Defendants have also intentionally deceived the public into believing that health care providers believe these products are superior to breast milk or even ideal, and that physicians and institutions endorse the Cow's Milk Products.

40.    Manufacturers have also repeatedly used their relationships with hospitals and the discharge process to encourage mothers to substitute formula for breastmilk even after they leave the hospital. K.D. Rosenberg, C.A. Eastham, et al, *Marketing Infant Formula Through Hospitals: The Impact of Commercial Hospital Discharge Packs on Breastfeeding*, AM J PUBLIC HEALTH, 98(2):290-295 (2008). Indeed, most hospitals in the U.S. distribute "commercial discharge bags packaged as smart diaper bags containing various coupons, advertisements, baby products, and infant formula samples." Yeon Bai, et al, *Alternative Hospital Gift Bags and Breastfeeding Exclusivity*, ISRN NUTR., article ID 560810: 2 (2013). These commercial gift bags send confusing signals to breastfeeding mothers and have been shown to negatively impact breastfeeding rates. *Id*. at 5. However, the practice continues since it is a very effective way to exploit potential formula customers.

41.     Abbott regularly advertises its products as providing "complete nutrition for immune support and brain and eye development." In promoting these messages Abbott regularly uses a variety of advertising methods including online, print, and TV commercials. The purpose of these advertisements is to ensure that new parents believe that Abbott's infant feeding products are on par or superior to breastmilk. An example of Abbott's marketing to consumers and the healthcare community is provided below:



42.     In an Abbott advertisement for another Similac product, the ad states "when you are ready to turn to infant formula, but you don't want to compromise, look to Pure Bliss by Similac. Its modeled after breast milk." Abbott uses a scene of a mother bottle feeding her baby with a window that opens to a field and in small, light-colored lettering, writes, "No significant difference has been shown between milk derived from rbST-treated and non-rbST-treated cows. Ingredients not genetically engineered." Abbott claims mothers should trust its "thoughtfully crafted" product which comes after "90 years of crafting" infant formula.[2]

---

[2] This is publicly available at https://www.youtube.com/watch?v=kRaHiTMyYXs.

16

43.     Abbott has also attempted to market its products specifically to preterm infants, who are in fact at highest risk from the dangers of the product. In 1978, Abbott began marketing "Similac 24 LBW," specifically for premature infants, claiming that the product was "introduced to meet the special needs of premature infants." In 1980, Abbott began marketing "Similac Special Care" claiming it was the first low-birth-weight, premature infant formula with a composition designed to meet fetal accretion rates." In 1988, Abbott introduced and marketed Similac Special Care With Iron, claiming it "was the first iron-fortified formula for premature and low-birth-weight infants introduced in the US." Abbott markets and sells multiple products specifically targeting "Premature/Low Birth-Weight Infants:" Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. Abbott markets these products using false and misleading messages to the general public and the medical community.

44.     One study estimates that formula manufacturers, like Abbott, spent $4.48 billion on marketing and promotion in 2014 alone. P. Baker, et al, *Global Trends and Patterns of Commercial Milk- based Formula Sales: Is An Unprecedented Infant and Young Child Feeding Transition Underway?*, PUBLIC HEALTH NUTRITION (2016).

45.     The misleading messages mothers receive from images, articles, and advertising in doctors' offices, hospitals, popular magazines, websites, and in now social media campaigns are often most successful when employing medical authorities to suggest that breastfeeding is unnecessary and difficult, if not impossible, to achieve. See generally B.L. Hausman, *Rational Management: Medical Authority and Ideological Conflict in Ruth Lawrence's Breastfeeding: A Guide for the Medical Profession*, TECH. COMM. QUARTERLY, 9(3), 271-289 (2000).

46.     In a study on infant feeding advertisements in 87 issues of Parents magazine, a popular parenting magazine, from the years 1971 through 1999, content analysis showed that breastfeeding rates decreased after the frequency of infant formula advertisements increased. J. Stang, et al, Health *Statements Made in Infant Formula Advertisements in Pregnancy and Early Parenting Magazines: A Content Analysis*, INFANT CHILD ADOLESC NUTR., 2(1):16-25 (2010). In addition, the authors found that infant formula company websites, along with their printed materials, coupons, samples, toll-free infant feeding information lines, and labels may mislead consumers into believing that they are purchasing a product equivalent or superior to human milk, which further induces reliance on information from a biased source. *Id.* The Defendants have also developed psychological advertising campaigns which attempt to create a perception of "mommy wars." One advertisement from Abbott, which received significant attention, was called "The Mother Hood." In this ad, Abbott depicts a gang war between mostly mothers and a few fathers arguing about the best way to take care of their babies. The ad is effective in so much as it is manipulative. The advertisement, at one point depicts three "bottle feeding moms," and one of them proclaims: "Oh look, the breast police have arrived." The ad then depicts the "breastfeeding moms" with arrogant and superior appearing faces, and even disdainful mannerisms, with one of the moms proclaiming in a condescending voice, "100% breast fed - straight from the source," and a second mom grasping her breast in a profane manner. The negative portrayal of breastfeeding moms is subtle, but powerful, and casts the breastfeeding moms as judgmental and nasty, while portraying the bottle-feeding moms as nurturing victims. At the end, they all come together to rescue a baby in an errant stroller rolling down a hill, and the ad says, "[w]elcome to the sisterhood of motherhood" before closing with their product name and new hashtag, and reinforcing the idea that formula is good.

18

47.     On its website, Abbott also has a drop-down menu which mothers can use to help choose the formula Abbott recommends. One of the key questions it asks is whether the child was born prematurely. By clicking yes, the website directs the mother to another page about Similac NeoSure, another Cow's Milk Product. Abbott claims that Similac NeoSure "supports excellent growth in premature babies' gains in weight, length, and head circumference when compared to these gains in preterm babies fed term formulas." Abbott includes purported reviews from mothers with preterm infants in the NICU who discuss how wonderful and safe the products were for their babies. However, there is no mention of the risk of NEC and misleadingly suggests to these vulnerable mothers that the Cow's Milk Products are safe to use for their infants.

48.     Recognizing a shift in the medical community towards an exclusive human based diet for preterm infants, the Defendants began heavily promoting "human milk fortifiers," which misleadingly suggests that the product is derived from human milk, instead of being derived from Cow's Milk Products.  Examples of such advertisements used by Abbott are as follows:



49.     The Defendants have separately designed competing, systematic, powerful, and misleading marketing campaigns to deceive mothers to believe that: (1) Cow's Milk formula and fortifiers are safe; (2) Cow's Milk Products are equal, or even superior, substitutes to breastmilk;

19

and (3) physicians consider their Cow's Milk Products a first choice. Similarly, the Defendants market its products for preterm infants as necessary for growth, and perfectly safe for preterm infants, despite knowing of the extreme risks posed by Cow's Milk Products and failing to warn of the deadly disease of NEC and risk of death.

50.     Thus, despite the existence of alternative and safe human milk-based fortifiers, the Defendants continue to market and/or sell the Cow's Milk Products under the guise of being a safe product for its newborns and despite knowing the significant health risk posed by ingesting these products, especially to preterm, low weight infants.

## THE INADEQUATE WARNINGS

51.     Abbott promotes the use of their preterm infant Cow's Milk Products to parents, physicians, hospitals and medical providers as safe products that are specifically needed by preterm infants for adequate growth. This marketing is directed specifically to parents throughout the United States, including in and around Chattanooga, Tennessee, North Georgia, and to the medical community in and around these areas.

52.     Upon information and belief, the medical staff at Hamilton Medical Center are familiar with the marketing of Abbott's Cow's Milk Products.

53.     Despite the knowledge of the significant health risks posed to preterm infants ingesting the Cow's Milk Products, including the significant risk of NEC and death, Abbott did not warn parents or medical providers of the risk of NEC, nor did Abbott provide any instructions or guidance on how to properly use its Cow's Milk Products so as to lower the risk or avoid NEC or death.

54.     In fact, the Defendants do not provide any warning in its labeling, websites or marketing that discusses the risk of NEC and death with use of its Cow's Milk Products with preterm infants.

20

55.     For example, the only warning on Neosure, the product received by Ashton Brown and an Abbott Cow's Milk Product, specifically marketed for use with preterm infants states:

### PRECAUTIONS

- **Never use a microwave oven to warm formula.** Serious burns can result.
- Powdered infant formulas are not sterile and should not be fed to premature infants or infants who might have immune problems unless directed and supervised by your baby's doctor.

[1] Carver JD, et al. Pediatrics 2001;107:638-689.

[†] Compared to infants fed a formula without DHA and ARA in a clinical trial with Similac Special Care and Similac NeoSure infant formulas with iron; prior to the addition of lutein.

[2] Groh-Wargo S, et al. Pediatr Res 2005;57:712.718.

[‡] Visual acuity measured at 4 and 6 months corrected age and assessed by VEP (visual evoked potential).

[3] O'Connor DL, et al. Pediatrics 2001;108:359-371.

[§] Based on a subset of infants in a post-hoc analysis.

[4] Canfield LM, et al. Eur J Nutr 2003;42:133-141.

[¶] No significant difference has been shown between milk derived from rbST-treated and non-rbST-treated cows.

[5] Schweigert FJ, et al. Eur J Nutr 2004;43:39-44.

[6] Patton S, et al. Lipids 1990;25:159-165.

[7] Rubin LP, et al. J Perinatol 2012;32:418-424.

56.    Similarly, the warning on Similac's Neosure Cows' Milk Product, the version of Similac given to Ashton Brown, for example, contains literally no warning about the dangers of NEC and has no warning whatsoever that it could lead to intestinal problems:



57.    If the Infant's medical providers had been warned about the risks of NEC associated with Similac NeoSure, the medical providers would not have administered Similac Neosure or would have warned the Parents about the risks of NEC associated with Similac Neosure, and the Infant would not have developed NEC.

22

58.    Parents are bombarded with TV commercials, magazine advertisements, coupons, and emails touting the benefits of Abbott products prior to the births of their children. The labels of Abbott's products all indicate the same thing: healthy for children.

59.    Abbott's website contains the following information on Similac Neosure products:

> Similac NeoSure is complete nutrition for babies born prematurely. Our post-discharge baby formula has increased protein, vitamins, and minerals compared to term infant formula and promotes excellent catch-up growth. This special blend has protein, calories, vitamins, and minerals, including calcium, to help your baby grow. Similac NeoSure is from the #1 infant formula brand for premature babies.*
>
> • **#1 PREMATURE INFANT FORMULA BRAND***: And the #1 brand fed in the NICU
>
> • **EXCELLENT CATCH-UP GROWTH:** Supports better gains in weight, length, and head circumference for premature babies when compared to term infant formula
>
> • **SUPPORTS BRAIN & EYE DEVELOPMENT:** Has our unique blend of DHA, lutein, & vitamin E to support brain and eye development
>
> • **HELPS SUPPORT BONE GROWTH:** Our formula has calcium and phosphorus for baby's growing bones
>
> • **NO ARTIFICIAL GROWTH HORMONES†:** The first leading infant formula brand with no artificial growth hormones

60.    Parents are regularly exposed to similar marketing messages from Abbott as it relates to its Similac products and believe that Similac products are a trusted and safe brand for their infants to use because of the messages they receive from Abbott's promotional efforts.

23

## THE AVAILABILITY OF ALTERNATIVE, SAFER DESIGNS

61.     There are human milk-based formulas and fortifier products which are feasible alternatives to the premature infant formula and fortifier products offered by Abbott.

62.     Since 2006, Prolacta Bioscience has manufactured and sold premature infant fortifiers and formulas which contain no cow's milk, but rather 100% human donor milk. This product is an example of a feasible alternative.

63.     Knowing that its cow's milk-based products are dangerous, Abbott has attempted to remove the harmful effects of cow's milk-based products by creating Similac Alimentum.

64.     Similac Alimentum states that it "starts reducing excessive crying due to cow's milk protein sensitivity, in most infants, within 24 hours". (Exhibit A)

65.     Similac claims that their hydrolyzed protein formulas, "[have] broken down proteins that are hypoallergenic and easy to digest…" (Exhibit A)

66.     Abbott has also been sued by Evolve Biosystems, Inc. for patent infringement on Evolve's product Evivo which attempts to lessen the harmful impact of cow's milk in the premature infant's gut through the use of a probiotic, *B. infantis*. *Evolve Biosystems, Inc. and the Regents of the University of California v Abbott Laboratories*, 19-CV-5859 (N. Dist of Illinois, Eastern Division).

67.     In its Answer and Counterclaim to this Complaint, Abbott admitted to the following:

        a.      Abbott admits that scientists have long appreciated that the microbiome in the infant gut can impact infant health. Abbott admits that, in a healthy infant gut, beneficial bacteria can promote health in various ways.

24

b. Abbott admits that it had been developing a combination probiotic product containing the three bacteria strains *Bifidobacteria infantis* (*B. infantis*), *Streptococcus thermophilus* (*S. thermophilus*), and *Bifidobacteria bifidus* (*B. bifidus*), referred to as Similac® Probiotic Tri-Blend, for years prior to any discussions with Evolve or the commercial launch of Evolve's Evivo® product. Abbott further admits that it had preliminary and early exploratory business discussions with Evolve beginning in 2018 for co-promotion of Evivo®, and that Abbott informed Evolve in August 2019 of Abbott's commercial strategy to promote both probiotic products, with Similac® Probiotic Tri-Blend focused on administration to preterm and low-birthweight infants and Evivo® focused on administration to term and normal-birth-weight infants.

c. Abbott admits that it trained its sales team to prepare for the launch of Similac® Probiotic Tri-Blend and that Abbott in fact launched Similac® Probiotic Tri-Blend. Abbott admits that its Similac® Probiotic Tri-Blend is on sale. (pg. 7) Abbott admits that it is a healthcare leader in pediatric nutrition in the United States and that its portfolio includes the Similac® brand. Abbott admits that for many years it has provided certain infant nutrition products—including, but not limited to Similac® Probiotic Tri- Blend—to hospitals and NICUs free of charge.

d. Abbott admits that it supplies Similac® Probiotic Tri-Blend for use by care providers in the NICU.

e. Abbott is a global healthcare leader that helps people live more fully at all stages of life through life-changing technologies and products. It is a known and trusted brand worldwide that serves people in more than 160 countries and that has been discovering new ways to make a lasting impact on health for more than 130 years.

25

f.      As a global leader in pediatric nutrition, Abbott makes products to help babies and children grow, that work to keep their bodies strong, and that support their unique nutritional and therapeutic needs. Abbott offers a diverse line of research-driven pediatric nutritional products, including under the Similac®, Elecare®, Pediasure®, Pedialyte®, and Vital® Peptide brands. Every day, Abbott pediatric nutrition products nourish more than 11 million babies and children. In particular, and for more than 90 years, Abbott has helped give babies a strong start with Similac®, a complete line of milk and soy-based infant and toddler formulas that support healthy growth and development of a baby's eyes, brain, and immune system by delivering essential protein, minerals, and nutrients.

g.      In August 2019, Abbott introduced Similac® Probiotic Tri-Blend, which supports the developing immune system of infants by promoting the development of a healthy gut microbiome with beneficial bacteria, referred to as "probiotics." Similac® Probiotic Tri-Blend consists of a multi-strain combination of three probiotic bacteria: *B. infantis*, *S. thermophilus*, and *B. lactis*. In its first year of availability, Similac® Probiotic Tri-Blend has been adopted by hospitals across the United States as an essential nutritional tool to promote a healthy gut microbiome in infants in neonatal intensive care units ("NICUs") and newborn wards. But the adoption of Similac® Probiotic Tri-Blend, and thus its availability to provide significant benefits to very vulnerable infant populations, has been negatively impacted by Evolve's tortious business practices.

h.      Care providers have been administering the *B. infantis* bacterium with human milk and infant formula products for decades before any of Evolve's patents. In fact, Evolve is well-aware that [portions redacted], an independent panel of experts

26

advising the Food & Drug Administration (FDA) regarding the safety of Evolve's *B. infantis* strain authored a report [portions redacted].

      i.     Scientists have long been aware that an infant's diet greatly contributes to which bacteria species colonize and thrive in the infant gut. At least by the 1990s, the scientific literature reported that feeding infants human milk helps create conditions that favor the dominance of *Bifidobacteria* over bacteria in the infant gut:

> It is well known that feeding infants exclusively on human milk (HM) has a specific effect on the appearance of the stools as well as on the composition of their microflora when compared with formula feeding. HM creates conditions which favour the growth and dominance of bifidobacteria and repress the development of other obligate and facultative anaerobes, particularly of *Bacteroides* spp., clostridia and enterobacteria.[3]

      j.     By the 2000s, probiotic formulations containing *B. infantis*, including ABC Dophilus, Infloran, and FloraBaby, had been developed and were commercially available. Clinical studies administering these *B. infantis* products with human milk and infant formula products were published and demonstrated their health benefits to improving the infant gut microbiome. For example, a clinical study published in 2005 by Bin-Nun *et al.* reported that administering ABC Dophilus (a probiotic mixture of *B. infantis*, *Streptococcus thermophiles*, and *Bifidobacteria bifidus*) with mother's milk or Abbott's Similac® Special Care infant formula reduced both "the incidence and severity of [necrotizing enterocolitis] in premature infants with no accompanying adverse events."[4]

---

[3] See Kleessen B *et al.*, *Influence of two infant formulas and human milk on the development of the faecal flora in newborn infants*, Acta Paediatr, 84:1347-56, 1347 (1995) ("Kleessen 1995").
[4] *See* Bin-Nun *et al.*, *Oral probiotics prevent necrotizing enterocolitis in very low birth weight neonates*, Journal of Pediatrics, 147(2):192-196, 196 (2005) ("Bin-Nun 2005").

k.       To distinguish the prior art before the Patent Office, the inventors were

required to limit their patent claims to specific prebiotic products derived from human milk

that meet particular process, structural, and functional claim limitations.

> First, each '872 patent claim requires the presence of particular "oligosaccharides" that "naturally occur in human breast milk." Evolve (and the named inventors of the '872 patent) did not invent these human milk oligosaccharides, and Evolve was not the first to identify these human milk oligosaccharides. The inventors admitted during prosecution of the '872 patent that "[t]he claims encompass oligosaccharides from human milk that were known in the art." '872 Patent Prosecution History, June 20, 2011 Amendment at 7. They further explained that "[t]here are a large number of oligosaccharides found in human milk, and their identities were largely known." Id. at 8. The Patent Office agreed that the prior art, including prior art by Abbott, taught "oligosaccharides [that] are identical to the oligosaccharides as presently claimed." '872 Patent Prosecution History, January 19, 2011 Office Action at 3 (citing U.S. Patent No. 6,045,854 (Abbott's "Prieto '854 patent") and Thurl S *et al.*, *Quantification of individual oligosaccharide compounds from human milk using high-pH anion-exchange chromatography*, Analytical Biochemistry, 235:202-206 (1996) ("Thurl 1996")).

> Second, each '872 patent claim is limited to "synthetic" prebiotic compositions that contain "purified" human milk oligosaccharides. Evolve's patent claims do not extend to natural human milk products, including mother's breast milk that is commonly used in NICUs to feed her infant. The '872 patent claims further require that the human milk products be processed in a manner that would purify these claimed human milk oligosaccharides. Merely supplementing mother's milk with an additive, such as a fortifier, does not meet the requirement for purified human milk oligosaccharides.

l.       Abbott first considered developing a tri-blend probiotic product containing

*B. infantis* in late 2012 after attending a research conference where preliminary results were

presented from an Australian clinical trial administering the probiotic ABC Dophilus to

preterm infants. See Jacobs SE *et al.*, *Probiotic effects on late-onset sepsis in very preterm*

*infants: A randomized controlled trial*, 132(6):1055-1062 (2013) ("Jacobs 2013"). ABC

Dophilus was a probiotic mixture of *Bifidobacteria infantis, Streptococcus thermophilus,*

28

*and Bifidobacteria bifidus* that had been publicly available at least as early as 2005. See Bin-Nun 2005.[5]

68.     Abbott's pleadings in the *Evolve* case are an admission that it understands that it's cow's milk-based Similac products are unsafe to the guts of premature infants and significantly increase the risk of N.E.C. and death and need to be changed to prevent further harm.

69.     Abbott has attempted to lessen the harmful impact of its cow's milk-based products by introducing Human Milk Oligosaccharides to select formulas. In an article available on Abbott's website, Flora Baby, "Why Human Milk Oligosaccharides Are a Breakthrough: *How Human Milk Oligosaccharides (HMOs) Support Immune Health for Infants,*" Abbott boasts that it has developed the first infant formula with HMOs:

> We all know about the benefits of breast milk and, as moms, of course we want to give our babies the very best. But the reality is that not every mom can breastfeed, either exclusively or at all.
>
> That's where the benefit of years of pioneering Abbott research comes in. Dedicated to helping mothers provide their babies with the best nutrition, Abbott researchers continuously analyze breast milk, the "gold standard" of infant nutrition, in an effort to unlock its potential for formula-fed babies around the world.[6]

70.     In another article, available on NutritionNews. Abbott, "The Power Of Human Milk Oligosaccharides: *Human Milk Oligosaccharides are beneficial prebiotics that can nourish your baby's immune system,*" Abbott reports that "[u]ntil now, human milk oligosaccharides have only

---

[5] *See* Abbott's Answer and Counterclaim, *Evolve Biosystems Inc, et al* 19-CV-05859 (N. Dist. of Illinois, Eastern Division), filed Nov. 30, 2020, Doc. 143, at pp 3, 6, 7, 9, 12, 22, 23, 24, 26, 31, 32, 37, 38, 52.

[6] NutritionNews.Abbott, Why *Human Milk Oligosaccharides Are a Breakthrough: How Human Milk Oligosaccharides (HMOs) Support Immune Health for Infants,* available at https://www.nutritionnews.abbott/pregnancy-childhood/infant-toddler/breakthroughs-in-infant-nutrition/.

been found in breast milk, but thanks to Abbott's cutting-edge research, even moms who choose to use formula can provide their babies with them too."  The Abbott Nutrition article reports that:

> After six weeks, researchers discovered that five immune markers were nearly identical between babies who were breastfed and those who were fed Similac with 2'-FL HMO. The clinical study, published in the Journal of Nutrition, showed that infants fed Similac infant formula supplemented with 2'-FL HMO had the prebiotic in their blood and urine similar to breast fed infants and the same rate of growth as breastfed infants.

> These are ground-breaking results because they show that babies fed the infant formula have an immune response more like breastfed infants," Buck explains. "2'FL HMO helps support a baby's immune system because it helps close multiple gaps in immune function between formula-fed and breastfed babies.

> Abbott was the first company in the world to launch an infant formula with 2'-FL HMO. Adding HMO* to the formula brings it closer to breast milk than ever before.[7]

71.    As depicted below, Abbott even advertises the claim that the human milk oligosaccharides added to its products "may dramatically curb intestinal inflammation and reduce the risk of NEC:"

---

[7] NutritionNews.Abbott, *The Power Of Human Milk Oligosaccharides: Human Milk Oligosaccharides are beneficial prebiotics that can nourish your baby's immune system,* available at:
https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-power-of-human-milk-oligosaccharides/#:~:text=Human%20milk%20oligosaccharides%20are%20beneficial%20prebiotics%20that%20can%20nourish%20your%20baby's%20immune%20system&text=With%20a%20perfect%20blend%20of.gold%20standard%20for%20infant%20nutrition.



72.     The development of these probiotics and hydrolyzed protein formulas and fortifiers by Abbott Laboratories, Inc. shows that it knows that its cow's milk-based products are defective in their present condition and are dangerous to the premature guts of infants.

73.     Moreover, the fact that other formulas in use today are available without cows milk products establishes that alternative formulas exist that can satisfy the nutritional and labeling requirements for the lawful marketing and sale of pre-term infant formulas.

## TOLLING OF STATUTE OF LIMITATIONS

74.     Due to the misleading marketing and lack of adequate warnings on its products, Plaintiff did not know and could not have known of the link between NEC and Cow's Milk Products like those at issue in this case and did not discovery such a link until within one year of filing of this Complaint.

31

75.     Moreover, the misleading and improper marketing campaigns designed to promote Cow's Milk Products as a safe alternative to breast milk products caused Plaintiff to believe that Abbott's products were safe for their intended use. Had Plaintiff known of these dangers or had Abbott adequately warned of these dangers at the time that the Infant was exposed to Abbott's Cow's Milk Products they would not have permitted such to be used on their children.

## COUNT I: STRICT LIABLITY AS TO ABBOTT'S DESIGN

76.     Plaintiff realleges all paragraphs previous and subsequent to this paragraph as if fully set forth herein.

77.     Where any of the allegations contained in this Count I are inconsistent with the allegations contained in any other Count in this Complaint, Count I is pled in the alternative.

78.     At all times material to this action, Abbott was engaged in the sale, and/or marketing and/or design, and/or manufacture, and/or distribution of Cow's Milk Products, which are defectively designed and unreasonably dangerous to consumers, including the Infant. As a result, Abbott is and should be considered a "manufacturer" as that term is used throughout the Georgia Product Liability Act, OCGA § 51-1-11.1, *et seq* (the "GPLA").

79.     Abbott, as a manufacturer, has a duty to hold the knowledge and skill of an expert and is obliged to keep abreast of any scientific discoveries and are presumed to know the result of all such advances.

80.     At all times material to this action, the Cow's Milk Products manufactured, distributed and/or sold by Abbott, were in a defective and unreasonably dangerous condition at the time the products were placed in the stream of commerce for nutritional use for preterm infants.

81.     At no time did Plaintiff or their medical providers alter or change the condition of the Cow's Milk Product and such persons used the Cow's Milk Product for their intended purpose

and consistent with the product's anticipated and customary usage.

82.     Abbott specifically marketed and created its Cow's Milk Products for use as nutrition and nutritional supplements for preterm infants, like the Infant here.

83.     Abbott's Cow's Milk Products are expected to and does reach the user without substantial change affecting that defective and unreasonably dangerous condition.

84.     Prior to December 2011, Abbott was aware or should have been aware that its Cow's Milk Products were not safe for use, as they were used, with nutrition or nutritional support in preterm infants, yet they took no steps to prevent the use of these products in such situations.

85.     Abbott knew or should have known that the use of its Cow's Milk Products with preterm infants was unreasonably dangerous in that its Cow's Milk Products significantly increased the risk of NEC and death.

86.     Furthermore, scientific data and well researched studies have concluded that the Cow's Milk Products of the Defendants carried unreasonable risks of NEC and death, which far outweighed the products' benefits for preterm infants like the Infant here.

87.     Despite the foregoing, the Defendants continued to sell and market its defective products to preterm infants.

88.     The products were defectively manufactured and designed and unreasonably dangerous, including, but not limited to the following particulars:

    a.  The product did not perform as safely as an ordinary consumer would expect when used in the intended or reasonably foreseeable manner, such that the use of Cow's Milk Products as nutrition or nutritional supplements in preterm infants significantly increased the risk of NEC and death;

    b.  The product contained hidden and dangerous design defects and was not reasonably safe as intended to be used, subjecting preterm infants, such as the Infant, to risks of serious bodily injury and death;

    c.  The product failed to meet legitimate, commonly held, minimum

33

safety expectations of that product when used in an intended or reasonably foreseeable manner;

d. Defendants failed to utilize economical and technically available safer design alternatives for preterm infant formula and fortifiers;

e. The product was manifestly unreasonable in that the risk of harm so clearly exceeded the product's utility that a reasonable consumer, informed of those risks and utility, would not purchase the product;

f. Defendants failed to adopt an adequate or sufficient quality control program; and/or

g. Defendants failed to inspect or test their products with sufficient care.

89.    As a direct and proximate cause of the Cow's Milk Products' unreasonable dangerous condition, the Infant suffered serious bodily injury, which resulted in their death.

**WHEREFORE**, Plaintiff, by and through undersigned counsel, demands judgment against Defendants, Abbott Laboratories and Abbott Laboratories, Inc., for all applicable wrongful death damages, costs of this action, post-judgment interest, and trial by jury.

## <u>COUNT II: NEGLIGENCE AS TO ABBOTT</u>

90.    Plaintiff realleged all paragraphs previous and subsequent to this paragraph as if fully set forth herein.

91.    Where any of the allegations contained in this Count II are inconsistent with the allegations contained in any other Count in this Complaint, Count II is pled in the alternative.

92.    Abbott, as the manufacturer and/or seller of Cow's Milk Products, owed a duty to the consuming public in general, and Plaintiff in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users and patients, when said product is used in its intended manner.

93.    Abbott, as a manufacturer, has a duty to hold the knowledge and skill of an expert and is obliged to keep abreast of any scientific discoveries and are presumed to know the result of

34

all such advances.

94.     Abbott, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed and/or sold the subject Cow's Milk Products.

95.     At no time did Plaintiff or the Infant medical providers alter or change the condition of the Cow's Milk Product and such persons used the Cow's Milk Product for their intended purpose and consistent with the product's anticipated and customary usage.

96.     The Defendants breached the duty owed to Plaintiff and acted negligently in their actions, including, but not limited to, the following:

    a.  Designing the product such that there are latent and not obvious dangers for consumers and patients while the product is being used in a foreseeable and intended manner;

    b.  Designing the product such that the product contained hidden and dangerous design defects and was not reasonably safe as intended to be used, subjecting preterm infants to risks of serious bodily injury and death in that the product's design and/or manufacture amounted to and/or resulted in a defect failure mode of the product;

    c.  Failing to collect data to determine if its products were safe for preterm infants;

    d.  Failing to collect data to determine when and how its products could be used safely;

    e.  Failing to utilize the significant peer reviewed research to develop instructions;

    f.  Failing to develop evidence-based guidelines or instructions to decrease the risk of its products causing NEC and death;

    g.  Failing to provide evidence-based guidelines or instructions to decrease the risk of its products causing NEC and death;

    h.  Failing to stop or deter its products from being fed to extremely preterm infants like the Infants here;

    i.  Failing to provide evidence-based instructions or guidance on when or how an extremely preterm infant should be transitioned to the product;

    j.  Failing to continuously and vigorously study its cow-based products in order to avoid NEC and death in premature infants;

    k.  Failing to utilize economical and technically available safer manufacturing and/or design alternatives for the preterm infant formula and fortifier; Failing to adopt an adequate or sufficient quality control program; and/or

35

  l. Failing to inspect or test their products with sufficient care.

97. Abbott knew or should have known that its products were to be used as nutrition and nutritional supplements with preterm infants.

98. Abbott knew or should have known that the use of its Cow's Milk Products with preterm infants was unreasonably dangerous in that its Cow's Milk Products significantly increased the risk of NEC and death.

99. Furthermore, scientific data and well researched studies have concluded that the Cow's Milk Products of the Defendants carried unreasonable risks of NEC and death, which far outweighed the products' benefits for extremely premature infants.

100. As a direct and proximate result of the negligence of Abbott, the Infant suffered serious bodily injury, which resulted in death.

**WHEREFORE**, Plaintiff, by and through undersigned counsel, demands judgment against Defendants, Abbott Laboratories and Abbott Laboratories, Inc., for all applicable wrongful death damages, costs of this action, post-judgment interest, and trial by jury.

## COUNT III: FAILURE TO WARN AS TO ABBOTT

101. Plaintiff realleges all paragraphs previous and subsequent to this paragraph as if fully set forth herein.

102. Where any of the allegations contained in this Count III are inconsistent with the allegations contained in any other Count in this Complaint, Count III is pled in the alternative.

103. Abbott, as the manufacturer and/or seller of Cow's Milk Products, owed a duty to the consuming public in general, and Plaintiff in particular, to properly warn and provide adequate warnings or instructions about the dangers and risks associated with the use of Cow's Milk Products with preterm infants, specifically including but not limited to the risk of NEC and death.

36

Abbott, as the manufacturer and/or seller of Cow's Milk Product, was unreasonable in relying upon any intermediary, including physicians, other health care providers or health care staff, to fully warn the end user of the hidden dangers and risks in its Cow's Milk Products, as the magnitude of the risk involved is using Defendants' Cow's Milk Products with preterm infants is significant and involves the real danger of serious bodily injury and death.

104.    Abbott, as the manufacturer and/or seller of Cow's Milk Product, owed a duty to fully warn and instruct any intermediary, including physicians, other health care providers or health care staff, of the significant dangers in its Cow's Milk Products.

105.    At no time did Plaintiff or the Infant's medical providers alter or change the condition of the Cow's Milk Product and such persons used the Cow's Milk Product for their intended purpose and consistent with the product's anticipated and customary usage.

106.    The Defendants owed a duty to provide warnings and instructions on its Cow's Milk Products marketed and/or sold for use with preterm infants that adequately communicated information on the dangers and safe use of the product to health care providers and staff using these products in a Newborn Intensive Care Unit ("NICU"), taking into account the characteristics of, and the ordinary knowledge common to, such prescribing health care providers and administering health care staff and to specifically warn of the risks and danger associated with the use of Cow's Milk Products with preterm infants, specifically including but not limited to the risk of NEC and death.

107.    Rather than provide adequate warnings, Abbott developed relationships which included incentives and financial gain to health care providers and facilities for using their Cow's Milk Products within the NICU, such that health care providers and facilities had an incentive to withhold any instructions and/or warnings from the end user.

108.    In addition and/or in the alternative, if healthcare providers and health care staff had been properly instructed and warned of the risks associated with the use of Cow's Milk Products with preterm infants, they would have not used such a dangerous product. Abbott, as a manufacturer, has a duty to hold the knowledge and skill of an expert and is obliged to keep abreast of any scientific discoveries and are presumed to know the result of all such advances.

109.    Abbott, through their own testing and studies, consultants and experts, and/or knowledge of the scientific literature, as more specifically set forth in **The Science and Scope of the Problem** Section knew of the significant risk of NEC with preterm infants and death.

110.    The Defendants, through its knowledge, review, and survey of the scientific literature, as detailed in **The Science and Scope of the Problem** Section, knew that the use of Cow's Milk Products with preterm infants could cause severe injury, including but not limited to NEC and death.

111.    Abbott breached the foregoing duties and failed to provide proper warnings and/or instructions of their Cow's Milk Products, including but not limited to the following acts:

    a.  Providing **no warnings** regarding the risk of NEC and death;
    b.  Providing inadequate labeling that failed to warn of the risks of use of Cow's Milk Products with preterm infants, including but not limited to NEC;
    c.  Failed to provide proper instructions or guidelines or studies, or data on when and how to feed its products to preterm infants in order to decrease the risk of NEC and/or death;
    d.  Failed to provide dosing or weight and age appropriate dosing instructions as to reduce the risk of NEC and/or death;
    e.  Failed to insert a warning or instruction that parents needed to be provided an informed choice between the safety of human milk versus the dangers of the Defendants' Cow's Milk Product;
    f.  Failed to provide instructions to consumers and health care providers that the Defendants' products carried a significant risk that its Cow's Milk Products could cause their baby to develop NEC and die;
    g.  The warnings and instructions are severely inadequate, vague, confusing, and provide a false sense of security in that they warn

38

and instruct on certain conditions, but do not warn on the use of Cow's Milk Products significantly increasing the risk of NEC and death and fail to provide any details on how to avoid such harm;

h.  Failed to contain a large and prominent "black box" type warning that its Cow's Milk Products are known to significantly increase the risk of NEC and death when compared to Human Milk in preterm infants;

i.  Failed to provide well researched and well-established studies that linked its Cow's Milk Products to NEC and death in preterm infants;

j.  Failed to cite to or utilize current up-to-date medical data on the proper and safe use of its product;

k.  Failed to otherwise warn the FDA, physicians, and healthcare providers of the extreme risks associated with feeding preterm infants Cow's Milk Products;

l.  Failed to send out "Dear Dr." letters warning of the risks of NEC and death and the current scientific research and data to better guide the hospitals and physicians to better care for the extremely preterm infants;

m.  Failed to advise physicians and healthcare providers that Cow's Milk Products are not necessary to achieve growth and nutritional targets for preterm infants; and/or

n.  Failed to contain sufficient instructions and warnings on the Cow's Milk Products such that health care providers and health care staff were not properly warned of the dangers of NEC with use of Cow's Milk Products and preterm infants.

112.   The Plaintiff here were never told or informed by either Abbott or any medical professional that Abbott's products or Cow's Milk Products generally could result in premature infants developing a dangerous and lethal medical condition like NEC.

113.   As a direct and proximate result of Abbott's failure to warn, the Infant suffered serious bodily injury, which resulted in death.

**WHEREFORE**, Plaintiff, by and through undersigned counsel, demands judgment against Defendants, Abbott Laboratories and Abbott Laboratories, Inc., for all applicable wrongful death damages, costs of this action, post-judgment interest, and trial by jury.

## PRAYER FOR RELIEF

Plaintiff request that the Court enter judgment against the Defendants as follows:

1.    Awarding Plaintiff compensatory damages in an amount according to proof at trial;

2.    Awarding Plaintiff an amount for the emotional distress and non-economic losses sustained as a result of Defendants' conduct;

3.    Awarding Plaintiff punitive damages;

4.    Awarding damages for past, present, and future emotional distress or non-economic losses; past, present, and future out of pocket costs and attorney fees; past, present, and future loss of enjoyment of life; past, present, and future pain and suffering; past, present, and future mental anguish; past, present, and future lost income and/or lost revenue and/or lost profits and/or lost business opportunity; loss of revenue earning capacity; costs related to medical or mental health treatment which might occur in the future if OR which Plaintiff might be recommended to have, or which he might have been recommended;

5.    Awarding pre-judgment and post-judgment interest;

6.    Awarding attorney's fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

7.    For such other and further relief as the Court deems just and proper.

Dated: March 24, 2022

Respectfully submitted,

*/s/ David Cates*
David Cates (#6289198)
**CATES MAHONEY, LLC**
216 West Pointe Drive, Suite A
Swansea, IL 62226
Telephone: (618) 277-3644
Facsimile: (618) 277-7882
dcates@cateslaw.com

*/s/ Benjamin A. Gastel*
J. Gerard Stranch, IV* (ARDC #6334061)
Benjamin A Gastel* (ARDC #6337307)
Janna Maples* (ARDC #6340270
**BRANSTETTER, STRANCH & JENNINGS, PLLC**
223 Rosa L Parks Avenue, Suite 200
Nashville, TN 37203
Phone: (615) 254-8801
Fax: (615) 255-5419
gerards@bsjfirm.com
beng@bjsfirm.com
jannam@bsjfirm.com

Stephen M. Reck
Jose Rojas
Scott D. Camassar
Paul Levin
**LEVIN, ROJAS, CAMASSAR, & RECK, LLC**
CT Juris No. 441679
391 Norwich-Westerly Rd
North Stonington, CT 06359
Phone: 860-535-4040
Facsimile: 860-535-4040
attorneyreck@yahoo.com
rojas@ctlawyer.net
sdcamassar@gmail.com
plevin1111@aol.com

*Admitted Pro Hac Vice*
*Counsel for Plaintiff*

41